*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 2, 2024

Plaintiff-Appellee,

v

No. 359988
Ingham Circuit Court

ALI HUSAN KEJJAN,

LC No. 17-000727-FC

Defendant-Appellant.

Before: N. P. HOOD, P.J., and JANSEN and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for second-degree criminal sexual conduct (victim under 13 years old) (CSC-II), MCL 750.520c(1)(a), and accosting a child for an immoral purpose, MCL 750.145a.[1] Defendant was sentenced to 24 to 180 months' imprisonment for the CSC-II conviction and 85 days for the accosting a child for an immoral purpose conviction. We affirm.

## I. BACKGROUND

This case arises from an incident where defendant sexually assaulted SP, who was 11 years old at the time. Defendant was convicted of CSC-II and accosting a minor for immoral purposes.

On the evening of May 23, 2017, SP got ready for bed and went to her room to sleep for the night. SP's bedroom was on the second floor of the house. The house also had a basement with an entertainment area and a main floor with a half bathroom. On the same evening, SP's mother and stepfather had guests over to the house to play cards and watch a basketball game. Defendant, SP's grandmother, and two other adults were present for the get-together. All of the

---

[1] Defendant was also charged with first-degree criminal sexual conduct (victim under 13 years old), MCL 750.520b(1)(a), but the charge was dismissed by the court.

guests were downstairs in the house's basement after SP went to bed. At one point during the night, defendant excused himself from the group to go use the bathroom on the main floor.

SP woke up to defendant touching the back of her thighs and stroking her rear. Defendant had unbuckled his belt while he stroked her thighs. SP told defendant to stop touching her and leave her room. However, defendant continued to touch her and used his fingers to touch the outside of SP's vagina. Defendant then licked SP's left cheek. He also asked SP if he could lick her vagina. SP again told defendant to stop, and defendant finally stopped touching SP and left.

About 20 minutes after defendant had left the basement, SP's mother and the other guests noticed defendant had been gone for a "long time." At the same time as defendant returned to the basement, SP's mother received several texts and a call from SP telling her to come upstairs to SP's room. SP's mother went to her room, and SP told her what had happened with defendant. The following day, SP had a sexual-assault medical examination performed at the hospital. The nurse then performed a visual examination of SP and took a swab of SP's left cheek where defendant had licked her. The Michigan State Police Laboratory tested both SP's and defendant's DNA against the swab of SP's cheek. The report concluded that there was "very strong support that [defendant] [was] a contributor to the DNA profile developed from the left cheek swabs." Defense counsel did not call any expert witnesses during trial to provide additional information regarding the results of the DNA lab report.

Defendant speaks Arabic as his first language and was initially represented by attorney Keith Watson. In September 2017, the district court had ordered that defendant be appointed an Arabic interpreter for the duration of the court proceedings. In March 2018, attorney Frederick Blackmond replaced Watson as defendant's counsel. In October 2018, the circuit court[2] also ordered that defendant be appointed an interpreter throughout the case's proceedings. However, Blackmond did not secure an interpreter for defendant's trial and no interpreter was present. Additionally, defendant did not testify at trial.

During closing arguments at trial, Blackmond argued that any DNA evidence of defendant found on SP's cheek was simply from an innocent kiss. Specifically, Blackmond stated, "[T]he DNA was a kiss on the cheek. [There is] no other DNA of [defendant's] found on [SP's] body; [it is] a kiss on the cheek and we [cannot] dispute that because the DNA is there. [There is] also other liquid there that they [cannot] or they [did not] process about DNA. Um, and so [I would] ask you to take a look at that, too." At the close of trial, the jury found defendant guilty of CSC-II and accosting a child for an immoral purpose.

Following trial, defendant timely filed a motion for a new trial and for a *Ginther*[3] hearing and argued that Blackmond had been ineffective as defendant's counsel for failing to secure an Arabic interpreter for trial. Two orders had been entered requiring an interpreter for defendant, and defendant never waived his right to an interpreter. Further, because there was no interpreter

---

[2] The circuit judge who signed the October 4, 2018 Order Appointing Certified/Qualified Interpreter was not the same circuit judge who presided over defendant's September 2021 trial.

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

and defendant did not understand English, defendant was effectively prevented from being present at his own trial or participating in his own defense. Defendant also argued Blackmond was ineffective for failing to present expert testimony regarding the DNA report and for misleading the jury during his closing argument when he referred to the DNA evidence taken from SP's cheek as a "liquid." The prosecution responded and argued that defendant was a bilingual individual who was fluent in English. Because defendant spoke and understood English, Blackmond was not ineffective for failing to secure an interpreter. Likewise, because defendant did not require an interpreter, defendant was not prevented from being present at trial. Further, Blackmond was not ineffective for stipulating to the admissibility of the DNA report or for using the word "liquid" in his closing argument because both actions were part of a reasonable trial strategy. Specifically, it was a reasonable strategy to argue that the DNA from SP's cheek may have come from an age-appropriate and nonsexual kiss.

At the motion hearing, both parties argued consistently with their written submissions. The court agreed with defendant that a *Ginther* hearing was necessary to determine defendant's English ability and whether he required an interpreter. The *Ginther* hearing was then held in October 2022. The court concluded that defendant never indicated to the court that he was unable to understand English. Further, both Watson and Blackmond testified that defendant spoke to them exclusively in English during their meetings with defendant throughout the case. While an Arabic interpreter who translated for defendant during one preliminary examination stated defendant could not read or write in English, the interpreter did testify that defendant spoke English. Further, during a competency examination conducted in English, defendant told his interviewer that he understood English. Thus, the court concluded defendant was "comfortable in speaking the English language," and thus, an interpreter was not necessary at trial due to defendant's English abilities. Additionally, the court concluded that the DNA report was properly admitted by the court and the court had properly explained to the jury that any statements made by attorneys during closing arguments are not considered evidence. The court subsequently denied defendant's motion for a new trial.

## II. STANDARD OF REVIEW

Defendant argues his trial counsel was ineffective for not securing an interpreter for defendant during trial, for failing to present expert testimony regarding the DNA report, and for using the word "liquid" during closing argument to describe the sample taken from SP. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Anderson*, 322 Mich App 622, 627-628; 912 NW2d 607 (2018) (quotation marks and citation omitted). "[A] trial court's findings of fact, if any, are reviewed for clear error, and questions of law are reviewed de novo." *Id*. at 628.

## III. FAILURE TO SECURE LANGUAGE INTERPRETER

Defendant argues that his trial counsel was ineffective for failing to provide him with an interpreter during trial. We disagree.

A criminal defendant's right to counsel is guaranteed by both the United States and Michigan Constitutions. See US Const, Am VI; Const 1963, art 1, § 20. For a defendant to prevail on a claim of ineffective assistance of counsel, he must satisfy the two-part test of *Strickland v*

*Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Trakhtenberg*, 493 Mich 38, 51-52; 826 NW2d 136 (2012). A defendant "must establish (1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000), citing *Strickland*, 466 US 668.

Thus, "[e]ffective assistance of counsel is presumed, and [a] defendant bears a heavy burden of proving otherwise." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). Additionally, a defendant "must overcome a strong presumption that the assistance of his counsel was sound trial strategy, and he must show that, but for counsel's error, the outcome of the trial would have been different." *Id*. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). Further, a "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Regarding the appointment of an interpreter during court proceedings, under MCR 1.111(B)(1),

> [i]f a person requests a foreign language interpreter and the court determines such services are necessary for the person to meaningfully participate in the case or court proceeding, or on the court's own determination that foreign language interpreter services are necessary for a person to meaningfully participate in the case or court proceeding, the court shall appoint a foreign language interpreter for that person if the person is a witness testifying in a civil or criminal case or court proceeding or is a party.

Further, concerning the waiver of an interpreter, MCR 1.111(C) provides:

> A person may waive the right to a foreign language interpreter established under subrule (B)(1) unless the court determines that the interpreter is required for the protection of the person's rights and the integrity of the case or court proceeding. The court must find on the record that a person's waiver of an interpreter is knowing and voluntary.

Here, the district and circuit courts appointed defendant an interpreter in their respective orders. These orders both required that defendant be appointed an interpreter "until the conclusion of the case or until further order of the Court." There is no evidence in the record of any subsequent order modifying or vacating either order. There is also no evidence that defendant ever waived his right to an interpreter. We conclude that a reasonable performance by an attorney would have included the review of defendant's file and awareness of the two court orders requiring the appointment of an interpreter. Additionally, because (1) both court orders required an interpreter until the case was concluded or until further order of the court, (2) there was no following order modifying them, and (3) defendant did not waive his appointment of an interpreter, we conclude it was unreasonable for defendant's trial counsel to ignore the court orders and not secure defendant an interpreter for trial.

However, even though defense counsel's performance was below an objective standard of reasonableness, we conclude defendant failed to establish prejudice, that is, that there is a reasonable probability the outcome of the trial would have been different but for his counsel's error. *Sabin*, 242 Mich App at 656. The evidence presented during the *Ginther* hearing established that, in addition to Arabic, defendant also speaks and understands English. At the hearing, Watson testified that defendant "spoke English when speaking with [him]" and that "[defendant] is a bilingual person who speaks English and Arabic." Watson and defendant also spoke exclusively in English to each other during a meeting before the preliminary examination. Further, at the preliminary examination, the interpreter present told the court that, although defendant could not read or write in English, he could speak English. Watson also testified that he did not use an interpreter during his private meetings with defendant because "[defendant] had a clear understanding [of English] satisfying [Watson's] concerns about whether he understood what [they] were talking about." Additionally, defendant never asked Watson for an interpreter.

Blackmond then testified that defendant had "good skills" when he spoke "English verbally back and forth" with Blackmond during their private meetings. Further, Blackmond "understood everything [defendant] said to [him]," and defendant "communicated real easy with [Blackmond] in English." Blackmond stated that sometimes he would elaborate on certain concepts in more simplistic terms. However, Blackmond acknowledged, "[There] are Americans that speak English that I have to talk to them about certain words, too, [that] they [do not] know about." Defendant never told Blackmond that he needed an interpreter to speak to him or that he needed an interpreter for court. Further, during an interview with an investigator, defendant spoke English throughout the entirety of the interview and never indicated that he did not understand the investigator. Additionally, defendant was evaluated for English competency during the pretrial proceedings. Defendant spoke in English during the interview, and he never indicated that he did not understand English. Defendant was also offered an interpreter for the evaluation, but defendant declined an interpreter "because he understood English just as well as he understood Arabic for that interview." Further, Blackmond testified that, when he and defendant discussed trial strategy (in English), defendant told Blackmond that he did not want to testify because he "consumed alcohol and smoked marijuana on that night [of the incident]" and that he "[did not] have any memory of parts of the night."

Defendant testified he speaks English like a "street language." He stated he has difficulty understanding "more complicated words in English" and that he had trouble understanding what had been happening during trial. Defendant also stated he had wanted to testify during trial and that he had been nervous about speaking in English. Defendant confirmed that he never asked Blackmond for an interpreter during their meetings or during trial. Defendant also never told the court that he was unable to understand English. Additionally, Ziad Fadel, the interpreter who translated for defendant for one preliminary examination, testified that defendant "spoke English the way a factory worker would speak English." Fadel stated defendant's English proficiency was "rudimentary" and confirmed that defendant "speaks English, but [does not] read or write."

In all, we agree with the trial court that the evidence presented at the *Ginther* hearing supports the conclusion that defendant both speaks and understands the English language. We conclude defendant was comfortable speaking English throughout the court proceedings and never indicated that he did not understand what was being said. Even though an attorney in Blackmond's position should have been aware of the previous court orders requiring an interpreter for defendant

(and thus, Blackmond's performance fell below an objective standard of reasonableness), defendant was not prejudiced during his trial without an interpreter because he is competent in English. Further, we conclude defendant had the ability to testify in English at trial but chose not to because he could not remember parts of the incident. Thus, defendant was not denied the effective assistance of counsel during his trial.

Defendant also argues that he is entitled to a new trial because he was effectively prevented from being present at his own trial. "[A] defendant has a right to be present at a trial against him . . . , [and] lack of simultaneous translation impairs a defendant's right to confront witnesses against him and participate in his own defense." *People v Gonzalez-Raymundo*, 308 Mich App 175, 188; 862 NW2d 657 (2014). "Although occasional lapses will not render a trial fundamentally unfair, adequate translation of trial proceedings requires translation of everything relating to the trial that someone conversant in English would be privy to hear." *People v Cunningham*, 215 Mich App 652, 654-655; 546 NW2d 715 (1996).

In *Gonzalez-Raymundo*, the defendant did not speak *any* English, and no interpreter was present at trial. *Gonzalez-Raymundo*, 308 Mich App at 189-190. The Court granted the defendant a new trial because the error "effectively prevented [him] from being truly present at his trial." *Id*. at 190. In contrast, as discussed above, the evidence in this case established that defendant speaks and understands English. Further, even if defendant did not understand every single word spoken at trial, "occasional lapses [do] not render a trial fundamentally unfair." *Cunningham*, 215 Mich App at 654-655. Thus, because defendant speaks English, we conclude he was not prevented from being present at his trial or from participating in his own defense.

Further, we conclude defense counsel's failure to secure an interpreter at trial was not a structural error. "Structural errors are defects that affect the framework of the trial, infect the truth-gathering process, and deprive the trial of constitutional protections without which the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Gonzalez-Raymundo*, 308 Mich App at 186. As discussed above, because defendant spoke and understood English, defendant was not prevented from being present at trial or from testifying at trial. We conclude the framework of the trial was not affected and that the court was still able to reliably serve its function because defendant spoke and understood English.

IV. DNA REPORT AND CLOSING ARGUMENT REGARDING DNA EVIDENCE

Defendant argues that his trial counsel's performance was ineffective for stipulating to the admissibility of the DNA lab report and for misrepresenting the DNA evidence to the jury during his closing argument. We disagree.

"An attorney may not refer to facts that are not in the record." *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011). When an attorney references a fact that was not in the record during closing argument, "reversal is not required [if] the trial court clearly instructed the jury that the lawyer['s] statements and arguments are not evidence." *Id*. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Here, defense counsel stipulated to admit the DNA report into evidence and did not call any laboratory personnel to testify as to the information in the report. Again, "decisions regarding what evidence to present, what evidence to highlight during closing argument, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 2015. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *Russell*, 297 Mich App at 716. We conclude it was reasonable for defense counsel to rely on the analysis included in the DNA report instead of calling an expert witness to testify at trial. Defense counsel may have reasonably wanted to avoid the possibility that an expert's in-depth explanation of the report could have reflected unfavorably against defendant. Thus, we conclude that counsel's decision to stipulate to the admission of the DNA report as evidence and to not call a laboratory analyst to testify regarding the report were reasonable trial strategies, which this Court does not second-guess. See *id*.

Regarding defense counsel's closing argument, counsel stated, "[T]he DNA was a kiss on the cheek. [There is] no other DNA of [defendant's] found on [SP's] body; [it is] a kiss on the cheek and we [cannot] dispute that because the DNA is there. [There is] also other liquid there that they [cannot] or they [did not] process about DNA. Um, and so [I would] ask you to take a look at that, too." We conclude it was reasonable for defense counsel to present a rational and alternative explanation for the presence of defendant's DNA on SP's cheek. Thus, defense counsel reasonably argued that the jury should have considered that the DNA evidence on SP may have come from an innocent and appropriate kiss on her cheek. Additionally, although defense counsel described the substance on SP's cheek as a "liquid" (instead of a more precise term such as "sample" or "swab"), the trial court specially instructed the jury, "The lawyers' statements, their arguments; [that is] not the evidence. They are meant to help you understand the evidence; they are meant to have you understand each side's legal theories, but you should only accept things the lawyers say that you find is backed up by the evidence." Thus, even if defense counsel claimed that the DNA evidence on SP's cheek came from a "liquid," the trial court properly instructed the jury that an attorney's statements are not considered evidence. See *Meissner*, 294 Mich App at 457. Thus, because a jury is presumed to follow its instructions, we conclude defendant cannot show he was prejudiced by his counsel's statement. See *Graves*, 458 Mich at 486. Thus, defense counsel was not ineffective for using the word "liquid" during his closing argument concerning the DNA evidence on SP's cheek.

Affirmed.

/s/ Kathleen A. Feeney